## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| OKLAHOMA LAND HOLDINGS, LLC, | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Case No. CIV-17-1036-D |
| BMR II, LLC and ANDREW M. ASHBY, | ) | |
| *Defendants.* | ) | |

# O R D E R

Defendants[1] BMR II, LLC, and Andrew M. Ashby (collectively "Defendants") have filed a Motion for Summary Judgment [Doc. No. 76]. Plaintiff Oklahoma Land Holdings, LLC ("OLH" or "Plaintiff"), has filed a Response [Doc. Nos. 89, 104] in opposition, to which Defendants have replied [Doc. No. 111]. Plaintiff subsequently filed a sur-reply with leave of Court [Doc. No. 116].

Defendants filed a Motion to Strike [Doc. No. 108], asking the Court to strike certain exhibits attached to Plaintiff's Response. Plaintiff responded in opposition to the Motion to Strike [Doc. No. 120], and Defendants replied [Doc. No. 123]. The Motion to Strike and all related filings will be considered as objections herein. All matters are fully briefed and at issue.

---

[1] At one point during this litigation, Defendants were designated as Third-Party Defendants. Plaintiff herein was one of several Defendants also designated as Counter-Plaintiffs and Third-Party Plaintiffs. Following the dismissal of several claims and parties, the case style was modified to reflect the accurate burdens and relationships of the parties. *See* Motion to Modify Case Style [Doc. No. 86]; Order [Doc. No. 98]. The references in this Order reflect the correct relationships and modified case style.

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Universal Underwriters Ins. Co. v. Winton*, 818 F.3d 1103, 1105 (10th Cir. 2016). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The Court's inquiry must be whether the evidence, when viewed "through the prism of the substantive evidentiary burden," *Anderson*, 477 U.S. at 254, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Although the Court views all facts in the light most favorable to the nonmoving party at the summary judgment stage, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## BACKGROUND

The following is meant only as an overview of the case's factual background. Facts demarcated as disputed or undisputed will be set forth in the relevant subsections of this Order, as they pertain to each claim. The dispute at hand concerns oil and gas ventures in Oklahoma—more precisely, in a region known as the STACK or NW STACK

encompassed by Woodward, Dewey, and Ellis counties.  Defendant Andrew Ashby is an experienced engineer and president of BMR II.

There is now some dispute about whether Defendants were considering exploratory drilling projects in the STACK area before May 18, 2017.  This is relevant because sometime in April 2017, Bill Thomas spoke with Danny Schlachter[2] and discussed oil and gas deals. During these discussion, Mr. Schlachter offered to show Mr. Thomas a presentation Plaintiff OLH had developed with information on a play involving the NW STACK (the "OLH Presentation").

On May 2, 2017, the President of OLH, Rodney Moore, sent a Confidentiality Agreement [Doc. No. 76, Ex. 24] ("Confidentiality Agreement")[3] to Mr. Thomas by email, and Mr. Thomas signed and returned it that same day.  The parties dispute whether and how the OLH Presentation reached Defendants.  By early May 2017, however, there were meetings involving both Bill Thomas and Defendant Ashby, and Defendant Ashby decided to start leasing acreage for the NW STACK project, initially using his own money.  BMR

---

[2] Danny Schlachter is the president of Schlachter Operating Company, once a Third-Party Plaintiff to this lawsuit. Mr. Schlachter entered into a joint venture to explore the STACK area with Danick, an upstart company also working in the energy field.  *See* Response at 9. This joint venture was Oklahoma Land Holdings, LLC, Plaintiff. *Id.* Bill Thomas is a Mr. Schlachter's friend and Defendant Ashby's business partner.

[3] The Confidentiality Agreement contains a Non-Compete provision and a Non-Disclosure provision. *See* Confidentiality Agreement at 2–3; *see* Motion [Doc. No. 76] ("The first [key provision] is a "confidentiality/non-disclosure" provision.  The second is the non-compete provision." (citing Undisputed Material Facts Nos. 26, 27)). Mr. Thomas initiated the instant suit seeking to invalidate the Confidentiality Agreement but has since settled with Defendants out of court.  *See* Motion at 2.  Throughout their papers, the parties refer to the Confidentiality Agreement as the "NDA."

II, at that time, was not yet formed and there is some dispute as to whether Bill Thomas was to be a part of the entity.

BMR II was eventually formed as a Colorado entity on July 16, 2017, received funding from investors in September 2017, and was registered to do business in the State of Oklahoma on March 14, 2018. By April 2018, approximately 68,000 acres in the relevant area were acquired on BMR II's behalf, and all such acreage was transferred to BMR II by assignment that month. BMR II began drilling its first well in June 2018 and its "proof of concept" drilling program is ongoing.

## DISCUSSION

### I.   The Court will apply Texas, Oklahoma, and federal law to resolve these disputes.

The Court's jurisdiction is predicated upon the complete diversity of the parties, pursuant to 18 U.S.C. § 1332. The amount in controversy exceeds $75,000.00. "A federal court sitting in diversity . . . must apply the substantive law of the forum state, including its choice of law rules." *Otis Elevator Co. v. Midland Red Oak Realty Inc.*, 483 F.3d 1095, 1101 (10th Cir. 2007). Under Oklahoma law, different choice-of-law rules apply to actions that sound in tort and those that sound in contract. *Bernal v. Charter Cty. Mut. Ins. Co.*, 209 P.3d 309, 315 (Okla. 2009).

*a) Texas law applies to the contractual disputes.*

Oklahoma's choice-of-law rule for contract actions is bottomed on the terms of OKLA. STAT. tit. 15 § 162 (2009). Generally, "[t]he law of the state chosen by the parties

to govern their contractual rights and duties will be applied." *Telex Corp. v. Hamilton*, 576 P.2d 767, 768 (Okla. 1978).

Here, the contract at issue provides that the agreement is "governed by the laws of the State of Texas without regard to conflict of laws principles." Confidentiality Agreement [Doc. No. 76], Ex. 24 at 3; *see also* Motion at 19 n.14.  The Court finds no reason to disregard this provision, and therefore, Texas law governs the resolution of the breach of contract claim.

b) *The choice-of-law analysis as to the remaining claims sounding in tort dictates that Oklahoma law applies, unless displaced by federal law.*

In a tort action, Oklahoma follows the most-significant-relationship approach to conflict-of-laws issues. *Hawk Enter., Inc. v. Cash Am. Int'l, Inc.*, 282 P.3d 786, 790 (Okla. Civ. App. 2012) (applying Oklahoma law to resolve a tort claim despite a contractual provision indicating Texas law would govern disputes).  "Oklahoma choice of law rules require the court to apply the tort law of the state with the most significant relationship to the occurrence and to the parties." *Childs v. Okla. ex rel. Okla. State Univ.*, 848 P.2d 571, 578 n.41 (Okla. 1993).

To decide which state's law to apply, the Court considers the following factors: "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties occurred." *Brickner v. Gooden*, 525 P.2d 632, 637 (Okla. 1974).

Where the opposing parties are from different states, as they are here, the third factor favors neither party. *See Hawk*, 282 P.3d at 791. The business dealings of the parties, however, are centered around Oklahoma, and the agreement at issue contemplated that the obligations under the contract would be performed in Oklahoma. *See* Confidentiality Agreement, [Doc. No. 89], Ex.4. Further, the case "involves . . . oil and gas business ventures in the Anadarko Basin in northwest Oklahoma." Motion at 11; *see also* Confidentiality Agreement ("Receiving Party is interested in a possible transaction…within the area of [certain counties] in Oklahoma.").

Some of the conduct causing the alleged injury occurred out of state. But the allegedly protected information, the consequences of the alleged misappropriation, the land involved in the dispute, and the projects at issue all involve Oklahoma. *See Hawk*, 282 P.3d at 791 ("[A]lthough the . . . agreement contemplates that some of the obligations of the contract will be performed in Texas, the contractual obligation fundamental to Hawk's claim is the right to operate. . . within its exclusive Oklahoma City territory."). For these reasons, the Court finds that Oklahoma "has the most significant relationship to the occurrence and the parties" in this case. *Brickner,* 525 P.2d at 637. The Court therefore will apply Oklahoma law to the resolution of disputes sounding in tort, to the extent state law has not been displaced by applicable federal laws.

## II.     The objections to certain evidentiary material attached by Plaintiff are sustained in part and overruled in part.

Defendants contend that Plaintiff has attached certain evidence to its Response that "was never produced in discovery—even though it was repeatedly requested—as

well as certain documents that clearly pertain to inadmissible settlement discussions."
Motion to Strike at 1.  Further, they contend Plaintiff presents a "self-serving sham
affidavit . . . that contradicts their own deposition testimony."  *Id*.

      a) *The objections as to paragraphs 2,3,14 and Exhibit A of Rodney Moore's*
        *affidavit, paragraphs 3–5 of Exhibit 1, and paragraphs 9–10 of Exhibit 3 are*
        *sustained in part and overruled in part.*

First, Defendants argue that the Court should disregard certain portions of Rodney
Moore's Affidavit, submitted by Plaintiff as Exhibit 4 to its Response.  *Id*. at 2.  They argue
the content of the affidavit directly contradicts Moore's deposition testimony.  *Id*.

In considering a motion for summary judgment, the district court may disregard an
affidavit that conflicts with the affiant's prior deposition testimony if the conflicting
affidavit represents "an attempt to create a sham fact issue."  *Barber v. Hallmark Cards,
Inc.,* 74 F.3d 1248 (10th Cir. 1996).  The Tenth Circuit has described cases in which an
affidavit raises a sham issue as "unusual." *Law Co. v. Mohawk Const. & Supply Co.,* 577
F.3d 1164, 1169 (10th Cir. 2009).  In determining if an affidavit creates a sham fact issue,
courts consider whether: "(1) the affiant was cross-examined during his earlier testimony;
(2) the affiant had access to the pertinent evidence at the time of his earlier testimony or
whether the affidavit was based on newly discovered evidence; and (3) the earlier
testimony reflects confusion which the affidavit attempts to explain."  *Id*. (quoting *Ralston
v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 973 (10th Cir. 2001)).

Contrary to Defendants' assertions, there is no direct conflict between the affidavit
and the deposition testimony.  In his deposition, Moore states the following: "Luis and

Nick would have worked on creating the actual presentation to give to investors." Moore Dep. [Doc. No. 108], Ex. 1 at 11–12. The affidavit states that "[Moore] was personally involved in the creation of OLH's confidential information." Motion to Strike, Ex. 4 ¶ 2. The line of questioning during Moore's deposition focused on whether he was involved in creating the "actual presentation." Motion to Strike, Ex. 1 at 12–13. The testimony does not preclude the possibility that Moore was somehow involved in the process; clearly Moore had enough involvement in the creation of the OLH Presentation to answer the questions during his deposition. In context, there is no direct and clear conflict between both statements. Absent conflict between the two, there is no need to analyze whether the testimony creates a sham issue.

As to Exhibit A, Moore attests to the fact that this exhibit is "a true and correct copy of BMR II's presentation slides [] overlaid by those from OLH's presentation"; there is no expert opinion being offered on geological similarities between the two materials. To the extent that Moore analyzes the slides or provides any opinion on the science involved, the Court will disregard these analyses, as Moore is a lay witness and has testified to not having any geological background. *See* Motion, Ex. 1 at 6. These objections are sustained in part and overruled in part.

As to the Schlachter Affidavit, [Doc. No. 89, Ex.1], the Court again finds there are no contradictory statements. During his deposition, Schlachter testified that he had nothing to do with OLH's unregistered securities offering and its presentation materials. *See* Schlachter Dep., Ex.10 at 102:15–103:13. In his Affidavit, Schlachter addresses the expected value of the land. Schlachter Aff. ¶ 3. There is no directly contradictory

information and therefore no reason to continue with the analysis.  This objection is overruled.

There is likewise no inconsistency between Castillo's deposition testimony and paragraph 10 of the Castillo Affidavit [Doc. No. 89, Ex. 3].  In context, during the deposition Castillo was reminded of the details he is now attesting to in his affidavit. Plaintiff fails to respond to Defendants' contention that paragraph 9 in the Castillo Affidavit contradicts his testimony, but the Court nevertheless finds there are no contradictions. Castillo says in his deposition that a "slide deck may have been sent" and that an updated version was presented during a videoconference.  *See* Motion [Doc. No. 108], Ex. 8 at 76:13–25.  In his affidavit, Castillo states that "[w]e had previously sent a slide deck to them, and it was my understanding that we would be answering questions of a technical nature."  Castillo Aff. ¶ 9.  There is no direct contradiction here, and at the very most any inconsistency is akin to the notion that "the earlier testimony reflects confusion which the affidavit attempts to explain."  *Law Co. v. Mohawk Const. & Supply Co.,* 577 F.3d 1164, 1169 (10th Cir. 2009).  This objection is overruled.

> b) *Exhibit B to Exhibit 4 and Moore's Supporting Statements contained in ¶¶ 5–7 of Exhibit 4 are inadmissible under FED. R. CIV. P. 37(c)(1).*

Defendants claim the Confidentiality Agreements labeled as Exhibit B to Exhibit 4 [Doc. No. 105-2], should be inadmissible, as they were not produced at any point during discovery even though they were repeatedly requested. Rule 37 provides that:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) [which govern initial disclosures and required supplements thereof] shall not, unless such failure

is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

"The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir. 1999). A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. *Id.* Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness. *See Smith v. Ford Motor Co*., 626 F.2d 784, 797 (10th Cir. 1980).

Both parties agree that the existence of the Confidentiality Agreements was timely disclosed. *See* Reply at 3 ("Plaintiff was quick in all of its discovery responses to say it had asked all third parties to sign [Confidentiality Agreements]."). However, it appears Plaintiff failed to produce the actual documents, despite repeated requests for it to do so. The extent to which this delay in production was willful is unclear. Despite Defendants' contention that Plaintiff's failure to produce was dilatory, Plaintiff asserts that the documents were just recently identified. Trial has not yet been set, and as such the delay in production has caused no disruption. Further the Court would consider any proper request for Defendants to conduct discovery out-of-time to cure any perceived prejudice the delay may have caused. This objection is overruled.

c) *Objections as to Exhibits 8, 27, and 28 are sustained in accordance with* FED. R. CIV. P. *56(c)(2) and* FED. R. EVID. *408.*

Defendants object to Plaintiff including in its exhibits certain correspondence relating to the parties' attempts to settle the instant claims. Plaintiff argues the information—including drafts of an attempted settlement agreement—is meant to illustrate the relationship of the parties. Response at 8. Defendants deny that Bill Thomas acted as an agent on their behalf, and Plaintiff contends the exhibits at issue conclusively show Bill Thomas was negotiating on Defendants' behalf. Response at 7. Plaintiff does not dispute that this evidence would ordinarily fall within the scope of Rule 408's prohibition, but rather argues that it is being introduced for another, acceptable purpose. The Court disagrees.

The admission of settlement offers and settlements is generally prohibited under the Federal Rules of Evidence. *See* FED. R. EVID. 408. The plain text of Rule 408 permits evidence of a settlement to be admitted for purposes other than to prove the validity or amount of a claim. *See, e.g., Broadcort Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1194 (10th Cir. 1992); *see also O'Hearon v. Castleview Hosp.,* 156 F.3d 1244 (10th Cir. 1998). The purpose of Rule 408 is to encourage the settlement of disputes. *See Eisenberg v. Univ. of New Mexico*, 936 F.2d 1131, 1134 (10th Cir. 1991).

Even where evidence is not barred under Rule 408, courts perform a balancing analysis under Rule 403 of the Federal Rules of Evidence, "weighing the probative value of the proffered evidence against its potential for unfair prejudice to the objecting party." *Sw. Nurseries, LLC v. Florists Mut. Ins., Inc.,* 266 F. Supp. 2d 1253, 1258 (D. Colo. 2003);

*see also Johnson v. Land O'Lakes, Inc.*, 181 F.R.D. 388, 393 (N.D. Iowa 1998) (noting that evidence of settlements may have an "undue tendency to suggest decision on an improper basis").

The volume of information submitted—if the purpose is to show that Bill Thomas was negotiating on Defendants' behalf—is excessive.  All references to these exhibits within the Motion are about attempts to settle, and not about the relationship of the parties.  There are no references to Exhibits 27 or 28 anywhere in the Motion, and without any context, the Court cannot discern why the otherwise inadmissible materials were included. The Court therefore sustains Defendants' objections as to Exhibits 8, 27, and 28, finding that the materials fall within the prohibition of Rule 408, and to the extent that they do not, that the probative value of the evidence in explaining the relationship of the parties is outweighed by the potential for unfair prejudice.  *See Sw. Nurseries*, 226 F. Supp. 2d at 1258 (applying FED. R. EVID. 403 in a similar context); *cf. EEOC v. Gear Petroleum, Inc.,* 948 F.2d 1542, 1546 (10th Cir. 1991) ("[T]he risks of prejudice and confusion entailed in receiving settlement evidence are such that often . . . the underlying policy of Rule 408 require[s] exclusion even when a permissible purpose can be discerned").

> d)  *Defendants' Motion to Exclude [Doc. No. 74] and Motion to Strike [Doc.*
> *No. 81] were previously granted, and the relevant expert reports will not be*
> *considered.*

In a previous Order, the Court granted Defendants' Motion to Exclude Testimony of Jon Stromberg [Doc. No. 74].  The Court also granted Defendants' Motion to Strike [Doc. No. 81] Jon Stromberg's Amended Expert Report.  Accordingly, these reports will

not be considered.

## III.    Damages

Defendants contend that Plaintiff has failed to demonstrate any damages in this case. Motion [Doc. No. 111] at 15.  They argue that without Stromberg's report, there is no evidence of lost profits.  *Id*.  Defendants further argue there is no expert who can testify as to damages.  *Id*. at 45.

In a misappropriation claim, as an alternative to actual loss damages, damages may be measured by the imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of the trade secrets.  *Blue Star Land Servs., LLC v. Coleman*, No. CIV-17-931-R, 2017 WL 6210901, at *7 (W.D. Okla. Dec. 8, 2017) (quoting OKLA. STAT. ANN. tit. 78 § 88(A)).   Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation.  The reasonable royalty is generally used in the absence of proof of a defendant's profit and a plaintiff's loss.  *Uniform Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 826 (Okla. 2016) (quoting OKLA. STAT. ANN. tit. 78, § 86 (West)).  "A flexible approach is applied to the calculation of damages in a misappropriation of trade secrets case." *Coleman*, 2017 WL 6210901, at *7 (citing *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc*., 831 F. Supp. 1516, 1526 (D. Colo. 1993)).

Plaintiff here proffers minimally sufficient evidence to survive summary judgment as to damages.  There is testimony that Defendants' actions caused harm to Plaintiff, that the information conveyed an advantage to competitors, and that damages may be measured using recognized industry norms.  *See* Expert Designations [Doc. No. 81-3]; Moore Aff. ¶

13–14; Schlachter Aff. ¶ 3.

**IV.    The Confidentiality Agreement is unreasonable as a matter of law and the Court cannot reform the contract's material terms.**

Plaintiff asserts a breach of contract claim.  *See* Third-Party Complaint [Doc. No. 19] at 14.[4] Defendants argue, *inter alia*, that the Confidentiality Agreement constitutes an unreasonable and unenforceable restraint on trade as a matter of law.   Motion at 22. Further, they argue, there is no way for the Court to reform the contract to make it reasonable, rendering it unenforceable.   *Id*. at 22–24.   Plaintiff counters that the three-county boundary described by the Confidentiality Agreement is reasonable.   Response [Doc. No. 89], at 26.   Although it concedes the area covered is large, if the described boundaries were any smaller, Plaintiff argues it would have essentially revealed the targeted drilling location by tendering the Confidentiality Agreement.   *Id*.

Under Texas law, the hallmark of enforceability is whether a covenant not to compete is reasonable.   *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 655 (Tex. 2006) (citing TEX. BUS. & COM. CODE § 15.50(a)).   The enforceability of the covenant should not be decided on "overly technical disputes." *Sheshunoff*, 209 S.W.3d at 655.   "Rather, the statute's core inquiry is whether the covenant 'contains limitations as

---

[4] Plaintiff filed its Counterclaim and Third-Party Complaint [Doc. No. 19] and subsequently filed a second document entitled "Counterclaim and Third-Party Complaint." *See* [Doc. No. 23]. The Court *sua sponte* had the second pleading stricken, as "the parties did not seek leave of Court to file the amended pleadings." *See* [Doc. No. 26].  Plaintiff did not subsequently seek leave of Court, nor was an amended pleading filed after the Court issued its order.  The operative pleading, therefore, is the original Counterclaim and Third-Party Complaint [Doc. No. 19].

to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.'" *Id*. (quoting TEX. BUS. & COM. CODE § 15.50(a)); *accord Marsh USA Inc. v. Cook,* 354 S.W.3d 764, 777 (Tex. 2011)

Whether a covenant is a reasonable restraint on trade is a question of law for the Court. *Emmons v. Stewart Glass & Mirror, Inc*., No. 09-95-119-CV, 1996 WL 27935, at *3 (Tex. App.—Beaumont Jan. 25, 1996, no writ); *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *see also Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 386–88 (Tex. 1991) (determining reasonableness is a question of law). A restraint is unreasonable if it is broader than necessary to protect the legitimate interests of the business. *DeSantis v. Wackenhut Corp*., 793 S.W.2d 670, 682–84 (Tex. 1990) ("[T]he restraint created by the agreement must not be greater than necessary to protect promisee's legitimate interest.").

The Confidentiality Agreement at issue here denotes the following as protected from competition: "Oil and gas lease(s) and minerals within the area of Woodward, Dewey, and Ellis Counties, Oklahoma comprising up to 120,000 net acres of land [hereinafter "AMI Boundary"]." Motion, Ex. 28 at 3.

In a deposition, Plaintiff admits that this clause's "ambiguity was on purpose," and that a person signing it "[would have no idea] what area we're focusing on." Motion, Ex. 76 at 139: 8–25. Plaintiff testified that the clause was "not designating a specific area," and intended to cover "a much larger area than [120,000 acres] . . . it could be twice that size, it could be four times that size, I don't know the answer." *Id.* at 144:1–15.

Plaintiff argues that the geographical area requirement applies only to employment cases, where employees are prohibited from looking for work within a given area.  But the law applies this reasoning with equal force in cases outside of the employment context. *See PEG Bandwidth TX, LLC v. Texhoma Fiber, LLC*, 299 F. Supp. 3d 836, 846 (E.D. Tex. 2018) (disagreeing with the argument that these requirements do not apply outside of the employment context).  The definitions of "trade," "commerce," and "goods" in the relevant statute provide support for the same conclusions.  *See* TEX. BUS. & COM. CODE ANN. § 15.03 (West) (nowhere limiting the applicability of the law to the employment context and defining "goods" as "any property, tangible or intangible, real, personal, or mixed, and any article, commodity, or other thing of value, including insurance.").

Where Texas courts have found the requirements of the Texas Covenants Not to Compete Act inapplicable, cases have involved restraints on "using a single parcel of real property," *Rolling Lands Investments, L.C. v. Nw. Airport Management, L.P.,* 111 S.W.3d 187 (Tex. App—Texarkana 2003, pet. denied), or "a restraint on the use of fiber optic cables at the specific locations." *PEG Bandwidth TX,* 299 F. Supp. 3d at 846 (quoting a contract that specifically stated it was not barring competition).

The Confidentiality Agreement specifically prohibits certain competitive conduct within a specified geographical area—the acquisition of an interest or competition for control of any land or acreage within the AMI boundary.  It is not simply limiting the specific use of the land.  The agreement must therefore comply with the requirements of the Texas Covenants Not to Compete Act.  *See CBIF Ltd. P'ship v. TGI Friday's Inc*., No. 05-15-00157-CV, 2017 WL 1455407, at *14 (Tex. App.—Dallas Apr. 21, 2017) (applying

the standard set forth in TEX. BUS. & COM. CODE ANN § 15.50 to an agreement containing a geographical area limitation); *cf. Ehler v. B.T. Suppenas Ltd.*, 74 S.W.3d 515, 520–21 (Tex. App.—Amarillo 2002, no pet.) (discussing the application of the rules governing non-compete agreements on contracts involving real property).

To be reasonable, the competition restriction must contain a reasonable territorial limitation.  Plaintiff concedes the boundaries implicated by the language in the agreement are ambiguous.  At the very least, the geographical restraint encompasses an unspecified 120,000-acre space within an area comprising over 2,000,000 acres.  Plaintiff, however, contends it could be up to four times that size.  It is unclear if the acreage is contiguous. Perhaps, as Plaintiff suggests, it encompasses all land within the three counties.  *See* Motion, Ex. 27 at 129:8–25; 139:1–25;141:3–25.

Certainly, that a geographic restraint is included, and likewise that it is broad, is not dispositive. *See AmeriPath, Inc. v. Hebert*, 447 S.W.3d 319, 335 (Tex. App.—Dallas 2014, no pet.); *accord Gehrke v. Merritt Hawkins & Assocs., LLC,* No. 05-18-01160-CV, 2020 WL 400175, at *4 (Tex. App. Jan. 23, 2020). Plaintiff contends that if the AMI were any smaller, it would be tantamount to disclosing the targeted drilling area simply by tendering the NDA.  But the Court is skeptical that the information could not have otherwise been protected, perhaps by incorporating by reference the presentation materials that would be accessible only after the Confidentiality Agreement was signed.  Further, OLH owned only 1,000 acres in Ellis County, with no promise of being able to acquire more.  Motion at 23. This is analogous to having an employment non-compete covenant ban an entire region or group of clients, though the employee had no previous contact with them.  Texas courts

find such limitations unreasonable.  *See, e.g., Peat Marwick Main & Co. v. Haass*, 818

S.W.2d 381, 386–87 (Tex. 1991) (finding a provision was unreasonable because it applied

to customers and territory with which the employer had not had actual contact); *see also*

*Hardy v. Mann Frankfort Stein & Lipp Advisors, Inc.*, 263 S.W.3d 232, 250 (Tex. App.—

Houston 2007, pet. granted); *General Devices, Inc. v. Bacon*, 888 S.W.2d 497, 504 (Tex.

App.—Dallas 1994, no writ).

Further, in *Cobb v. Caye Publishing Group, Inc.*, an appellate court dissolved a

portion of a trial court's temporary injunction and modified the relevant geographical area

by further limiting it in scope.  At issue in that case was whether the geographical limitation

could include areas "where Caye Publishing intended to distribute publications at some

point in the future." 322 S.W.3d 780, 784 (Tex. App. 2010).  In *Cobb*, the trial court stated

in its temporary injunction order that without an injunction:

> Cobb would damage Caye Publishing's interests by displacing its exclusive
> right to use its research and be the first to enter markets "targeted by" Caye
> Publishing, thus usurping Caye Publishing's opportunity to fill the limited
> market void, and by capturing customer goodwill that would otherwise be
> winnable by Caye Publishing as the first and sole entrant into the targeted
> markets.

Caye Publishing had made "more than a cursory inquiry" into publishing in Parker

County. *Id*.  The *Cobb* court could not locate a case in which a geographical limitation

including areas where an employer did not currently operate but had targeted for future

potential expansion, standing alone, was reasonable. Further, evidence presented at the

temporary injunction hearing established that Caye Publishing had nothing more than a

potential business interest in Parker County.  The appellate court found the trial court had

abused its discretion in including areas of future potential business interest. *Publ'g Grp., Inc.*, 322 S.W.3d at 785; *accord GTG Automation, Inc. v. Harris, No.* 11-16-00317-CV, 2018 WL 5624206, at *4 (Tex. App. Oct. 31, 2018) (citing favorably to *Cobb* and agreeing with its reasoning on areas "targeted for future potential expansion").

Like in *Cobb*, the geographical scope of OLH's Confidentiality Agreement seeks to protect potential business interests not directly tied to a materialized or concrete business interest OLH held.  The ambiguity in the geographic limitation, paired with its large scope, make it unreasonable under Texas law.

Nevertheless, an unreasonable geographical limitation does not, *ipso facto*, render a covenant not to compete void and unenforceable.  *Cobb,* 322 S.W.3d at 784; *see Weatherford Oil Tool Co. v. Campbell*, 340 S.W.2d 950, 952 (Tex. 1960); *see also Lewis v. Krueger, Hutchinson & Overton Clinic*, 269 S.W.2d 798, 799 (Tex. 1954) ( "Merely because a limit has not been fixed for the duration of the restraint, the agreement will not be struck down but will be enforceable for such period of time as would appear to be reasonable under the circumstances.").

The court may reform the covenant to the extent necessary.  *Cobb*, 322 S.W.3d at 784.  In fact, the law requires a court to reform a non-compete agreement if it is unreasonably broad in scope. TEX. BUS. & COMM. CODE § 15.51(c).  A court, however, "may neither rewrite the parties' contract nor add to its language." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003); *see also Dahlberg v. Holden*, 238 S.W.2d 699, 701 (Tex. 1951) (stating that courts "have no right to interpolate or to eliminate terms of material legal consequence in order to uphold" a contract) (quoting 13 C.J. CONTRACTS

§ 496 (1917)). Nor may courts "consider only the parts favoring one party and disregard the remainder." *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005). Instead, the contract must be construed "as a whole," and "to determine what purposes the parties had in mind at the time they signed." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 841 (Tex. 2010); *accord Fischer v. CTMI, LLC*, 479 S.W.3d 231, 239 (Tex. 2016).

A contract need only be definite and certain as to those terms that are "material and essential" to the parties' agreement. *Radford v. McNeny*, 104 S.W.2d 472, 475 (Tex. 1937). Other courts have held that, under Texas law, material and essential terms are those that parties would reasonably regard as "vitally important ingredient[s]" of their bargain. *See Neeley v. Bankers Tr.* Co., 757 F.2d 621, 628 (5th Cir. 1985) (applying Texas law); *see also Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

The Court is mindful that an unreasonable geographical limitation alone does not render the Confidentiality Agreement unenforceable. The Court, however, can find no principled way to provide a reasonable alternative to the unreasonable restraint. The AMI is repeatedly referenced throughout the Confidentiality Agreement. The Court finds the AMI to be a material term not reasonably susceptible to the interpretation proposed. The interpretation of every provision of the Confidentiality Agreement is affected by the definition of AMI. This leaves no way to sever the provision and salvage the contract. *Cf. Hanks v. GAB Bus. Servs., Inc.,* 644 S.W.2d 707, 708 (Tex. 1982) (enforcing a promisee's

obligation to pay a final installment payment because that provision of the contract was independent of the promisor's covenant not to compete).

The Court finds the geographical limitation in the Confidentiality Agreement unreasonable, and unable to reform it, concludes that the Confidentiality Agreement is unenforceable.  Therefore, Plaintiff's breach of contract claim fails as a matter of law.

## V.      Without a valid contract, Plaintiff's tortious interference claim against Defendants fails as a matter of law.

Count 3 of Plaintiff's pleading is a tortious interference claim.  *See* Third-Party Complaint [Doc. No. 19] at 23.  This claim against Defendants is based on them having allegedly "interfered with the [Confidentiality Agreement] by inducing Bill Thomas to breach the agreement, and/or by acting in concert with him knowing that the result of his actions would result in a breach of the [Confidentiality Agreement]."  Third-Party Complaint at 13 ¶ 71.  In accordance with the choice-of-law analysis, *supra*, Oklahoma law applies here.

Oklahoma recognizes a tortious interference claim with a contractual or business relationship if the plaintiff can prove "(1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage." *Berry & Berry Acquisitions, LLC v. BFN Properties*, *LLC,* 416 P.3d 1061 (Okla. 2018).

Having held the Confidentiality Agreement unenforceable, Plaintiff cannot establish an element of its tortious interference claim, which thereby fails as a matter of

law. *See Wilspec Techs., Inc. v. DunAn Holding Grp.,* Co., 204 P.3d 69, 73 (Okla. 2009) (finding that in any tortious interference claim, "the inducer either prevents or hinders the performance of a *valid contract* to which it is not a party") (emphasis added); *see also Ellison v. An-Son Corp.,* 751 P.2d 1102, 1106 (Okla. 1987) ("The right to recover for the unlawful interference with the performance of a contract presupposes the existence of a valid enforceable contract.").

**VI.     The trade secret misappropriation claims cannot be decided as a matter of law.**

Plaintiff asserts two trade secret misappropriation claims against Defendants.  It alleges violations of the Defend Trade Secrets Act ("DTSA") in Count 1, and violations of the Uniform Trade Secrets Act, as adopted by Oklahoma and codified in OKLA. STAT. tit. 78 §§ 85–94 (2001) ("OUTSA"), in Count 2.  In its Response, Plaintiff disputes or otherwise objects to almost every relevant fact Defendants represent as undisputed in their Motion.  *See* Response [Doc. No. 89] at 12–14.  The parties agree, for the most part, on the experts' qualifications.  *See* Response at 17.  The Court will therefore layout the evidence supporting relevant facts, in the context of its analysis below.

*a)  Violations of the OUTSA*

Oklahoma adopted the Uniform Trade Secrets Act, OKLA. STAT. tit. 78 §§ 85–94 (2001) ("OUTSA").  To prove misappropriation of a trade secret under the OUTSA, Plaintiff must show: (1) the existence of a trade secret; (2) misappropriation of the secret by Defendants; and (3) use of the secret to Plaintiff's detriment.  *See MTG Guarnieri Mfg., Inc. v. Clouatre*, 596 P.3d 202, 209 (Okla. 2010).

*i. Existence of a Trade Secret*

First, the parties dispute whether a trade secret exists.  The OUTSA sets forth the definition of a trade secret in Oklahoma; in addition, the Oklahoma Supreme Court has adopted additional relevant factors. *Amoco Production Co. v. Lindley,* 609 P.2d 733 (Okla. 1980). The OUTSA, OKLA. STAT. tit. 78 § 86, defines a trade secret as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique or process, that: a. derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and b. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The additional factors are: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  *See Lindley,* 609 P.2d 7at 743. Whether information qualifies as a trade secret is a question of fact. *See Central Plastics Co. v. Goodson,* 537 P.2d 330, 333–35 (Okla. 1975).

Defendants argue that the information in the OLH Presentation was publicly available and readily ascertainable.  Certainly, it appears some of the underlying information used to develop the presentation was publicly available.  *See* Motion, Ex. 29 211:1–25, 212:1–6.  But the fact that some of the information was available to the public

is not dispositive. *See Iofina, Inc. v. Khalev*, No. CIV-14-1328-M, 2016 WL 5794793, at *2 (W.D. Okla. Oct. 4, 2016) (analyzing the OUTSA and noting that "[a] trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret" (quoting *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1108 (10th Cir. 2009) (applying a similar Colorado law)); *see also Retiree, Inc. v. Anspach*, 660 F. App'x 582, 588 (10th Cir. 2016) (applying a similar Kansas law).   It arguably took cumulative technical, geological, and other knowledge to compile the presentation. Plaintiff submits affidavits addressing the qualifications of those who worked on the presentation, along with evidence that shows these qualifications were important to developing the OLH Presentation. *See* Response [Doc. No. 104, Ex.15], at 2; Eucker Dep. 16:23–25; 17:01-07 ("And so how important is it for a geologist to have particular knowledge of a particular basin…Oh, it's—it's paramount.").   This disputes whether the OLH Presentation was as readily accessible as Defendants assert.

The evidence introduces a fact issue as to whether the OLH Presentation had any value to Defendants; Defendants' movement to invest in the NW STACK suggests it may have been.  For example, there is some indication that Defendants had previously targeted the area, as there exists an email from Defendant Ashby mentioning "STACK" as a topic of conversation before he had access to the OLH Presentation.  *See* Motion, Ex.13 at 1. But Plaintiff contends—and the evidence does not directly refute—that Defendants had not performed a detailed study on the area before making the large purchase, nor is it clear that

they had any specialized, recent knowledge about the area covered in the OLH Presentation. *See* Response, Ex. 19 at 14:11–17:23. Defendant Ashby was present during a call with OLH and Luis Castillo when relevant information was discussed. Response, Ex. 14. Soon after Defendants gained access to the OLH Presentation, it appears there was a significant change in position. Defendants counter that a vague news report indicated other companies in the area had invested money into this region. But this alone cannot conclusively show the OLH Presentation's information was of no value and unprotectable as a trade secret. *Cf. Goodson*, 537 P.2d at 333–35 (discussing information that does and does not constitute a trade secret under Oklahoma law).

What Plaintiff seeks to protect is the "compilation of information," used by a business to obtain economic advantage. *See Goodson*, 537 P.2d at 333 (stating that a "trade secret is a formula, pattern, device or compilation of information"). There is evidence that could lead to the conclusion that Plaintiff took reasonable steps to protect this information. Plaintiff issued NDAs to those who attended the meeting. *See, e.g.*, Motion, Ex. 15 at 61:20–25. Although these may have been poorly drafted, the poor drafting itself was admittedly done to protect the information at hand, and Defendants were aware Plaintiff sought to protect the information. *See* Motion, Ex. 76 at 139: 8–25; *see also Clouatre*, 239 P.3d 202, 213 (Okla. 2010) (finding that where it was disputed that the defendants signed an agreement, there was nevertheless knowledge that the information was to be kept confidential). That some people received agreements and others did not may weigh for or against the ultimate finding of a trade secret, however, that analysis is best left for the finder of fact.

25

*ii. Misappropriation of the Alleged Trade Secret*

Misappropriation is defined, in this context, as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," and as "disclosure or use of a trade secret of another without express or implied consent by a person who: at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." OKLA. STAT. tit. 78 § 86(2)(c) (2001); *Clouatre*, 239 P.3d at 212.

As illustrated by the short time frame between the meeting with OLH and the development of Defendant Ashby's "corridor map, [] buy area map, and his focus," and Defendant BMR II's "plan and execution of BMR II's leasing and proof-of-concept drilling program," there are disputed facts as to whether the information was valuable to competitors and, hence, to Plaintiff itself. *See* Sur-Reply at 10. There is also a genuine dispute as to whether misappropriation took place. *See* Response, Ex. 20 at 1, 1 (email from Bill Thomas to Andrew Ashby stating "[t]old him no, not interested in their AMI area"); *see* Reply at 4; *see also Black*, 584 F.2d at 952 (citing to Oklahoma cases and allowing for "facts and circumstances, when viewed in their totality, [to] permit the inference that there was [] misappropriation."). Defendant Ashby was allegedly aware that a Confidentiality Agreement was in place and commented on it being poorly drafted, refusing to sign it. Motion, Ex. 9, Ashby Dep. 31:18–32:20. There is sufficient competing evidence, viewed in the light most favorable to the non-movant, to create a genuine issue of material fact.

*iii. Damages*

Plaintiff argues that, under the OUTSA, monetary damages or restitution are appropriate remedies, and that a reasonable royalty may be awarded to compensate for the misappropriation of a trade secret. *See* Response at 40. As analyzed *supra*, there is sufficient evidence in the record to preclude summary judgment as to whether the information was used to Plaintiff's detriment.

In light of the current record, the Court cannot conclude the moving party is entitled to judgment as a matter of law. The state law claim for violations of the OUTSA is minimally sufficient to survive summary judgment.

*b) Violations of the DTSA*

The DTSA provides a private cause of action against those who have misappropriated trade secrets related to a product or service intended for interstate commerce. *See* 18 U.S.C. § 1836(b)(1). A DTSA violation involves: (1) trade matter, (2) reasonable secrecy, (3) independent economic value resulting from this secrecy, (4) acquisition of the trade secret, (5) improper means, (6) culpability, and (7) relation to interstate commerce. *See Coleman*, 2017 WL 6210901, at *4. There is substantial overlap between the state and federal legal standards for trade secret misappropriation claims. *See ATS Grp., LLC v. Legacy Tank & Indus. Servs. LLC*, 407 F. Supp. 3d 1186, 1200 (W.D. Okla. 2019) ("Furthermore,[] the OUTSA largely mimics the DTSA as to the definition of trade secret."). Whether a trade secret exists for purposes of the DTSA is a question of fact. *ATS Grp., 407 F. Supp. 3d at 1186* ("The question of whether certain information constitutes a trade secret under [the DTSA] ordinarily is best resolved by a fact finder.").

The analysis above, outlining how fact issues preclude a finding as a matter of law on the existence of a trade secret and the plausible value of the secret apply with equal force.

Under the DTSA, misappropriation" includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5). The DTSA further defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage." 18 U.S.C. § 1839(6)(A). "Although the state 'trade secrets' and 'misappropriation' definitions are nearly identical to the DTSA, [an OUTSA] [p]laintiff must additionally show 'use' and 'detriment.'" *Video Gaming Techs., Inc. v. Castle Hill Studios LLC*, No. 17-CV-454-GKF-JFJ, 2018 WL 3437083, at *7 (N.D. Okla. July 17, 2018) (quoting *Blue Star Land Servs., LLC v. Coleman*, No. CIV-17-931-R, 2017 WL 6210901, at *7 (W.D. Okla. Dec. 8, 2017)).

The Court concluded, *supra*, factual issues preclude granting summary judgment on misappropriation under the OUTSA. The same analysis leads to the conclusion that Defendants' DTSA claims survive summary judgment as well.[5] Therefore, summary judgment on Plaintiff's DTSA claim is denied.

## VII. The civil conspiracy claims fail as a matter of law.

Finally, Plaintiff argues that the civil conspiracy claim is not intended to serve as a separate cause of action, but rather, is meant to "attribute the acts of one conspirator to the other." Response at 38. Plaintiff argues the underlying wrong is that Defendants conspired

---

[5] Although not addressed in the analysis of the state law claim, the interstate commerce nexus element is undisputed.

with Bill Thomas to misappropriate its trade secrets. *Id*.

It is well settled that "[c]ivil conspiracy itself does not create liability." *Roberson v. PaineWebber, Inc.,* 998 P.2d 193, 201 (Okla. 1999). Rather, "[t]o be liable the conspirators must pursue an independently unlawful purpose or use an independently unlawful means." *Id*.; *Zagorski v. McAdam*, No. CIV-13-1209-D, 2014 WL 2982669, at *6 (W.D. Okla. July 1, 2014) (applying Oklahoma law).

Under Oklahoma law, to state a claim for civil conspiracy, a plaintiff must plead the following elements: 1) a combination of two or more persons; 2) an object to be accomplished; 3) a meeting of the minds on the object or course of action; 4) one or more unlawful overt acts; and 5) damages as a proximate result thereof. *See Gaylord Entertainment Co. v. Thompson*, 958 P.2d 128, 148 (Okla. 1998); *accord Hitch Enterprises, Inc. v. Cimarex Energy Co*., 859 F. Supp. 2d 1249, 1268 (W.D. Okla. 2012). The Supreme Court of Oklahoma has said that "unlike its criminal counterpart, civil conspiracy itself does not create liability." *Brock v. Thompson*, 948 P.2d 279, 294 (Okla. 1997).

In *Gaedeke Holdings VII v. Baker* the Tenth Circuit affirmed a district court's decision in *Gaedeke Holdings VII v. Mills*, finding that the OUTSA displaced a civil conspiracy claim under Oklahoma law. 683 F. App'x 677, 680 (10th Cir. 2017). In *Mills,* the defendants argued that the OUTSA had displaced the plaintiff's common-law claims for conspiracy, conversion, and unjust enrichment. *See Gaedeke Holdings VII, Ltd. v. Mills*, No. CIV-11-649-M, 2014 WL 347629, at *3 (W.D. Okla. Jan. 30, 2014). The defendants in *Mills* argued that this statute required the district court to dismiss the

plaintiff's three common-law claims. *Id*. The district court agreed with the defendants that the plaintiff's common-law claims were unavailable because "the Uniform Trade Secrets Act bars common law claims . . . that are based entirely on factual allegations of misappropriation of trade secrets." *Id*. The district court concluded that the plaintiff could not pursue its conspiracy claims, because those claims depended on the same facts alleged to support the claim for misappropriation of trade secrets, and the Tenth Circuit agreed. *See Baker*, 683 F. App'x at 680.

Indeed, the OUTSA "displaces conflicting tort, restitutionary, and other law of [the] state providing civil remedies for misappropriation of a trade secret." OKLA. STAT. tit. 78, § 92(A) (2001). As the district court in *Mills* noted, courts in the states which have adopted the Uniform Trade Secrets Act have held that the Act bars common law claims based entirely on factual allegations of misappropriation of trade secrets. *See Mills*, 2014 WL 347629, at *3 (collecting cases).

Plaintiff argues that conspiracy is not meant here as a separate claim, but rather only to "[enlarge] the pool of potential defendants from whom a plaintiff may recover for an underlying tort." *Brock*, 948 P.2d at 294. The Court can locate no guidance on point from the Oklahoma courts, and Plaintiff points to none, citing only to decisions out of California. The Court concludes that, because Plaintiff's conspiracy claims are based upon Defendants' alleged misappropriation of trade secrets, these claims are displaced by the OUTSA.

Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiff's civil conspiracy claims.

## CONCLUSION

For the reasons detailed herein, Plaintiff's breach of contract, tortious interference, and civil conspiracy claims fail as a matter of law.  A minimally sufficient showing of genuine disputes of material facts preclude summary judgment on Plaintiff's claims of trade secret misappropriation brought under the Defend Trade Secrets Act, 18 U.S.C. § 1839(4), and the Oklahoma Uniform Trade Secrets Act, OKLA. STAT. tit. 78 § 85, *et seq*.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 76] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED** this 27th day of July, 2020.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge